UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARGARET LITTLEJOHN,<br><br>Plaintiff,<br><br>v.<br><br>CAROLINE PHAM, in her official capacity as Acting Commodity Futures Trading Commission Chairman,[1]<br><br>Defendant. | Case No. 1:24-cv-01637 (TNM) |

## MEMORANDUM OPINION

Margaret Littlejohn sues her employer, the Commodity Futures Trading Commission (CFTC), for race discrimination and retaliation under Title VII. The CFTC moves to dismiss the case because Littlejohn filed her suit over a year after the alleged employment issues began, well past the 45-day window to file such complaints. The Court agrees. The agency's motion to dismiss will thus be granted.

I.

Margaret Littlejohn worked for the CFTC for ten years before she first filed a complaint against the agency. Am. Compl., ECF No. 15, ¶¶ 1–2.[2] In 2019 and 2021, she lodged two separate Equal Employment Opportunity (EEO) complaints. Am. Compl. ¶¶ 2–3. The parties settled them on October 16, 2021. Am. Compl. ¶ 3. Eight days later, the CFTC reassigned Littlejohn to a position in a different division with a new boss. Am. Compl. ¶¶ 4, 23–24. She

---

[1] Caroline Pham has been substituted as the current Acting Chairman of the CFTC under Federal Rule of Civil Procedure 25(d).

[2] CFTC consented to Littlejohn filing her amended complaint though it maintained that it had been filed one day late. Mot. Dismiss, ECF No. 14, at 1.

1

claims that her new supervisor knew that she is African American and that she had very recently settled EEO complaints against the agency. Am. Compl. ¶ 25.

The crux of her current complaint is that her new supervisor refused to assign her work for nearly two years before she finally was involuntarily reassigned to yet a third role in the agency. Am. Compl. ¶¶ 23–64. Understanding how it happened requires quite a bit of context. First, after her reassignment in October 2021, she did not hear from her new supervisor, Malcolm Hutchison, for nearly a month. Am. Compl. ¶ 26. When they spoke, Littlejohn claims that he assured her that the new role would not involve contact with her previous supervisors or their staff. Am. Compl. ¶ 27.

The next day, Littlejohn was invited to a human-resources meeting about staffing and hiring. Am. Compl. ¶ 30. She alleges that "human resources" was a "business function" under her "former direct supervisor" whom she had named in her discrimination complaint. Am. Compl. ¶ 31. Littlejohn emailed Hutchison about her concern, reminding him that because human resources was under her former boss, she would be unable to attend. Am. Compl. ¶ 32. Hutchison responded that she should still come because the meeting was not a formal human resources meeting, just an "internal planning meeting where we decide how we're going to staff ourselves." Am. Compl. ¶ 33.

Littlejohn forwarded Hutchison's email to the CFTC's Office of Minority and Women and Inclusion (OMWI), adding that her new boss "needed clarity about her new role" so that she would not be in "an awkward position" of telling him what she "could and could not do." Am. Compl. ¶ 34. Within days, OMWI met with Hutchison about Littlejohn's duties. Am. Compl. ¶ 35. Littlejohn also asked if she could have a discussion with OMWI so that she would be on the same page as her new boss. Am. Compl. ¶ 36. OMWI never met with her. Am. Compl.

2

¶ 38. Nonetheless, a few days later, she and Hutchison agreed on one topic she could help with, and he sent training to complete before she started. Am. Compl. ¶¶ 39–41. That same day, Littlejohn believes that Hutchison met with two of her previous supervisors who had been named in her EEO complaint. Am. Compl. ¶ 42.

By this point, it was mid-December. Am. Compl. ¶ 41. Littlejohn had been reassigned to her new division in October. Am. Compl. ¶ 23. Getting impatient, she reached out to two other directors in her new division offering to work. Am. Compl. ¶¶ 43–45. Finally, in mid-February, Hutchison emailed Littlejohn with a spreadsheet of duties that he thought would fit her new role. Am. Compl. ¶ 46. Littlejohn still felt that Hutchison's spreadsheet reflected confusion about contact with her former division, so she reached out to OMWI again. Am. Compl. ¶ 47. OMWI promised to follow up with Hutchison and to generate its own spreadsheet of the appropriate duties for her new role. Am. Compl. ¶ 48–49.

The next day, Littlejohn met with Hutchison about his new spreadsheet. He said that she had "g[iven] him a lot to think about, including succession planning for [her role]." Am. Compl. ¶ 52. He concluded that "he would need some time to consider before following up with her." Am. Compl. ¶ 53. She asked whether he consulted with anyone about his most recent spreadsheet; he admitted to meeting with two of her previous bosses who had been named in her discrimination complaints. Am. Compl. ¶¶ 50, 54. Hutchison never followed up with Littlejohn after the meeting. Am. Compl. ¶ 55.

Littlejohn followed up a few days later with another duty spreadsheet of her own. Am. Compl. ¶ 55. Hutchison said that he would "take the items into consideration." Am. Compl. ¶ 56. But Littlejohn alleges that instead, he "stopped directly communicating" with her and "did not assign her any more duties." Am. Compl. ¶ 57. She insists that he continued communicating

with and assigning work to his "five other direct reports, all of whom are White," none of whom "had engaged in protected EEO [Equal Employment Opportunity complaint] activity." Am. Compl. ¶¶ 58–60. Between late February 2022 and early May 2024, Littlejohn alleges that she received no work assignments in her new role. Am. Compl. ¶ 61.

Halfway through that period, she contacted an EEO counselor on May 12, 2023. Def. Ex. A at 1, ECF No. 14-1. A month later, she filed a formal complaint of discrimination. Am. Compl. ¶ 13. The next year, in March 2024, the Equal Opportunity Employment Commission issued its final decision that Littlejohn had not been the subject of discrimination. Am. Compl. ¶ 15. Two months later, Littlejohn was involuntarily reassigned to yet a third division in the CFTC. Am. Compl. ¶ 61.

Littlejohn now sues the CFTC for race discrimination and retaliation. Am. Compl. ¶¶ 65–72. She contends that her supervisor's failure to assign work for more than two years "irreparably damaged" her "career progress" because she had "no way to gain experience, learn new skills, or earn performance bonuses or awards." Am. Compl. ¶¶ 62–64. She also claims that she could not "obtain a promotion or another position" because during an interview, she "had nothing to tell a prospective employer about what she was doing in her current role." Am. Compl. ¶ 64.

The agency moves to dismiss this case, arguing that she did not timely file her claims within the required 45-day window. Mot. Dismiss, ECF No. 14. Littlejohn opposes dismissal. Opp. Mot. Dismiss, ECF No. 16. The motion is ripe for consideration. This Court has jurisdiction under 28 U.S.C. § 1331.

II.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A court must "draw all reasonable inferences from those allegations in the plaintiff's favor." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). While the Court must accept the facts in the complaint as true, it need not accept conclusory allegations that simply re-state the legal standard. *Ashcroft*, 556 U.S. at 678.

"[F]ailure to exhaust administrative remedies is not jurisdictional" under Title VII. *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (applying the principle to 42 U.S.C. § 2000e-16, the statute addressing discrimination in federal government employment). Instead, exhaustion is treated similarly to a statute of limitations. *Id.* Such affirmative defenses fall under Rule 12(b)(6). *Jones v. Dep't of Justice*, 111 F. Supp. 3d 25, 30 n.4 (D.D.C. 2015), *aff'd*, 2017 WL 3895064 (D.C. Cir. July 14, 2017).[3]

III.

The parties essentially agree on the basics about the right process for bringing employment claims. They do not dispute that federal employees first must bring discrimination complaints to an administrative agency before going to federal court. *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012); Mot. Dismiss at 5; Opp. Mot. Dismiss at 6–7. They also agree that employees should make their complaint within 45 days of the incident. 29 C.F.R.

---

[3] The classic *McDonnell-Douglas* burden-shifting framework that applies to Title VII cases at summary judgment does not apply at the motion-to-dismiss stage. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

§ 1614.105(a)(1); 29 C.F.R. § 1614.101(b) (showing the 45-day limit applies to Title VII, 42 U.S.C. § 2000e *et seq.*).

The parties disagree about how to define when the incident happened. In Littlejohn's eyes, "each day Defendant failed to assign [her] work was an act contributing" to the discrimination. Opp. Mot. Dismiss at 8. So the 45-day clock started afresh every day that she did not have an assignment, up to and including the day before she filed her complaint in June 2023. *Id.* The CFTC counters that the Court should begin the 45-day clock at the latest possible date that Hutchison last spoke to Littlejohn, February 2022. Mot. Dismiss at 5–6; Am. Compl. ¶¶ 13–16, 55–57. Using that date, Littlejohn failed to timely exhaust her claims because she waited well over a year before filing a complaint in June 2023. Mot. Dismiss at 5–6; Am. Compl. ¶¶ 13–16, 55–57. At bottom, the CFTC argues that Littlejohn collected a year's worth of paychecks while performing no work before filing a complaint, and she should not now be able to claim discrimination for a situation that was apparent to her for months. Mot. Dismiss at 5–6. So the central question is how to define the employment practice of failing to assign work: Is it a discrete act or a continuing violation?

The D.C. Circuit has robust doctrine surrounding continuing violations. It recognizes continuing violations in two scenarios: (1) "where defendants violated a statutorily imposed continuing obligation," or (2) "where the character of the challenged conduct as a violation did not become clear until it was repeated during the limitations period [of 45 days], typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality." *Loumiet v. United States*, 828 F.3d 935, 948 (D.C. Cir. 2016) (cleaned up); *see Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997). Littlejohn believes that the latter

scenario applies to the failure to assign work because it is only clearly illegal after the passage of time reveals its cumulative impact. Opp. Mot. Dismiss at 7–8.[4]

But this test only recognizes a continuing violation when that violation "did not become clear until it was repeated during the limitations period." *Taylor*, 132 F.3d at 765. The D.C. Circuit established this test in a case involving retaliatory employment actions over about two years. *Id.* at 759–60, 765. There, the plaintiffs were banished to "professional purgatory" after expressing concerns about a company reorganization. *Id.* at 759. They were denied "meaningful work, support staff, computer links and supplies," and "ostracized by former colleagues afraid to be seen with them." *Id.* Still, *Taylor* held that they could not avail themselves of the continuing violation doctrine because their "banishment" "amply manifested itself as a possible retaliation from the start." *Id.* at 765.[5]

*Taylor* is not an anomaly in this circuit. In *Earle*, an incarcerated defendant filed a § 1983 claim alleging that the District of Columbia had been continuously violating his rights throughout decades of incarceration because it had never informed him of his consular rights as a Jamaican citizen. *Earle v. District of Columbia*, 707 F.3d 299, 301–03 (D.C. Cir. 2012). The

---

[4] Littlejohn cites an Americans with Disabilities Act case with a different formulation of the test. Opp. Mot. Dismiss at 7. It recognized continuing violations as "claims that by their nature occur not on any particular day but over a series of days or perhaps years, [as long as the plaintiff] alleges that at least one act contributing to the claim occurred during the filing period." *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (cleaned up). This formulation does not emphasize that the violation must "become clear" when it is "repeated during the limitations period" as the older *Taylor* test does. In other words, *Mayers* merely requires one act to occur during the 45-day period regardless of when one would have realized that the ongoing acts were improper. But the *Mayers* interpretation has never been repeated in the D.C. Circuit since its publication in 2007. In contrast, the *Taylor* formulation has been adopted by the Circuit verbatim repeatedly since *Mayers*. *Loumiet*, 828 F.3d at 948; *Earle v. District of Columbia*, 707 F.3d 299, 306 (D.C. Cir. 2012); *Keohane v. United States*, 669 F.3d 325, 329 (D.C. Cir. 2012). So the Court adopts the *Taylor* formulation of the continuing-violations test that evaluates when the employment violation "bec[a]me clear." *Taylor*, 132 F.3d at 765.

[5] *Taylor* justified its holding in part because "continuing low pay" "cannot toll the statute of limitations." 132 F.3d at 765. Insofar as the case rests on the idea that low paychecks are not continuing violations, Congress has overruled that reasoning by statute. Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 3, 123 Stat. 5, 5–6. But the D.C. Circuit has cited *Taylor* multiple times since that statute's enactment, so its continuing-violations test is still good law. *See supra* note 4.

D.C. Circuit held that Earle "concede[d] the point" that the long-term violation was obvious from the start because he alleged that "each day [the District] failed to [inform him] was another lost opportunity for [him] to secure assistance." *Id.* at 307. This demonstrated that the "violation [did] not rest on the cumulative impact of the District's ongoing failure to inform Earle of his consular access rights." *Id.*

So too here. Littlejohn never suggests that she did not realize Hutchison's behavior could be retaliatory until the spring of 2023, when she initiated her administrative complaint. Opp. Mot. Dismiss at 6–8. Indeed, the facts she alleges would belie such an argument. She was vocally concerned about retaliation from both her old and new supervisors "from the start" of her reassignment. *Taylor*, 132 F.3d at 765. Littlejohn flagged Hutchison's assignments to the OMWI twice for opening retaliation opportunities from her old supervisors. Am. Compl. ¶¶ 29–34, 46–47. Her final meeting with him focused on what duties she could accomplish while avoiding them. Am. Compl. ¶¶ 51–56. More, her Complaint implies that those previous supervisors had some impact on Hutchison's decision to stop communicating with her. Am. Compl. ¶¶ 53–57.

Littlejohn also alleges that Hutchison stopped assigning work in retaliation for her prior protected EEO activity because he found it difficult to delegate duties that did not involve her previous division. Am. Compl. ¶¶ 23–60. He stopped communicating with her after she elevated the work-assignment issue to OMWI a second time. *Id.* Throughout all of this, Littlejohn was so dissatisfied with her situation that she reached out to other higher-ups for work and applied for another job. Am. Compl. ¶¶ 43–45, 64. All of these actions demonstrate keen awareness of the situation's potential retaliatory nature. The situation Littlejohn describes—receiving a federal paycheck month after month while being assigned no work—is either a

8

sinecure or blatant discrimination. Regardless, its illegality should have long been obvious to her.

Thus, this ongoing supervisory failure to assign work cannot be a "continuing violation." The limitations period for the failure to assign work begins when its character as a possible violation became apparent. *Taylor*, 132 F.3d at 765. Even if the Court assumes that potential retaliation was not apparent before February 2022—despite Littlejohn's repeated discussions about it—certainly the "cumulative impact" of receiving zero assignments would be clear well before nearly *fifteen months* had passed. *Id.* at 765. At the latest, Littlejohn should have realized within three months that something had gone terribly wrong. And the facts she alleges demonstrate that she had reached that realization long before she initiated EEO contact in May 2023. *See* 29 C.F.R. § 1614.105(a)(1).[6] Like *Earle*, she has effectively conceded the point. *Earle*, 707 F.3d at 307.

Other circuits have similarly declined to apply continuing violations theories when plaintiffs wait over a year to bring their claims. For example, in *Hall v. Bodine*, a plaintiff had been complaining for years about her exclusion from advanced training before she filed a complaint. 276 F.3d 345, 354 (7th Cir. 2002), *overruled in other part*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013) ("[T]he following cases are overruled *to the extent that they suggest a plaintiff may not rely on 'self-serving' evidence* to create a material factual dispute.") (emphasis added). Like Littlejohn, the *Hall* plaintiff, "by her own admission," "was on notice of the alleged discriminatory conduct well in advance of the limitations period." *Id.* As another, the Tenth Circuit rejected a continuing-violations argument when the plaintiff had "complained

---

[6] Littlejohn stops short of contending that *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006), a retaliation case, saves her exhaustion claim. Opp. Mot. Dismiss at 7. Rightly so. *Holcomb* does not address exhaustion or the continuing-violations doctrine. *Id.*; *Holcomb*, 433 F.3d at 902–04.

9

on three separate occasions, one of which was in writing," about the "alleged discrimination, demonstrating that she was aware of the need to assert her rights, yet failed to file a complaint with the EEOC until" years after her first internal conversation about the problem. *Lewis v. Oklahoma ex rel Bd. Regents Tulsa Comm. College*, 42 Fed. App'x 160, 165–66 (10th Cir. 2002). Littlejohn similarly repeatedly emailed about potential retaliation. *See supra* Part I.

In sum, Littlejohn cannot avail herself of the continuing-violations theory to save her claims' untimeliness.

* * *

The CFTC would go further. It asserts that the Supreme Court has rejected the entire continuing-violations doctrine, invoking *National Railroad Passenger Corp. v. Morgan* to support its argument. 536 U.S. 101, 113 (2002); Reply Mot. Dismiss, ECF No. 17, at 2. But since *Morgan*, the D.C. Circuit has repeated its continued-violations test, even once citing *Morgan* while discussing the doctrine's new contours after that decision. *See supra* note 4; *Mayers*, 478 F.3d at 368. So *Morgan* merely altered the continuing-violations analysis rather than eradicating it. Indeed, *Morgan* itself reserved multiple important issues in continuing-violations doctrine for another day. *See Morgan*, 536 U.S. at 114 n.7 (declining to decide whether "time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered"); *id.* at 115 n.9 (reserving the timely filing question with respect to

"pattern-or-practice" claims besides hostile-work-environment claims). The Court thus rejects CFTC's invitation to disregard the doctrine altogether.[7]

## IV.

In conclusion, Littlejohn's retaliation and race-discrimination claims fail because she did not timely file them. The Court will grant the CFTC's motion to dismiss for failure to state a claim under Rule 12(b)(6). An appropriate Order will issue today.

Dated: September 30, 2025                                     TREVOR N. McFADDEN, U.S.D.J.

---

[7] The CFTC also erroneously relies on *Moore v. Chertoff* for the proposition that courts may not apply continuing-violations doctrine where "plaintiffs are aware of the discriminatory nature of the acts if the basis for the continuing violation is a series of related acts." 437 F. Supp. 2d 156, 162–63 (D.D.C. 2006); Reply Mot. Dismiss at 4. This case would dilute the *Taylor* standard requiring plaintiffs to show that the series of acts' retaliatory nature *became clear* during the limitations period; merely being aware at any time would defeat a claim. But *Moore* resolved a conflict that no longer exists in D.C. Circuit precedent. The *Moore* Court faced two lines of cases that, at the time, were in tension: the *Taylor* line, which held that a series of retaliatory acts became time-barred if plaintiffs clearly knew about their retaliatory nature up-front, and the *Anderson* line, which held that plaintiffs could challenge discriminatory paychecks with no time-bar concerns for as long as they were receiving them. 437 F. Supp. 2d at 162–63 (discussing *Anderson v. Zubieta*, 180 F.3d 329, 332, 337 (D.C. Cir. 1999), and *Taylor*, 132 F.3d at 765). *Anderson* was vindicated by a statute that defined each discriminatory paycheck as a discrete discriminatory act that reset the time-bar clock. Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 3, 123 Stat. 5, 5–6. So the reasoning underpinning Moore's mere-knowledge formulation no longer applies because it accommodated paychecks.

11